**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND<br>EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NISHAD SINGH,<br><br>Defendant. | Civil Action No. 23-cv-1691<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Nishad Singh ("Singh" or "Defendant"), alleges as follows:

## SUMMARY

1.     Singh, together with Samuel Bankman-Fried ("Bankman-Fried"), Caroline Ellison ("Ellison"), and Zixiao "Gary" Wang ("Wang"), engaged in a scheme to defraud equity investors in FTX Trading Ltd. ("FTX"), a crypto asset trading platform, at the same time that they were also defrauding the platform's customers.[1]  FTX raised more than $1.8 billion from investors, including U.S. investors, who bought an equity stake in FTX believing that FTX had appropriate controls and risk management measures.  Unbeknownst to those investors (and to FTX's customers), Bankman-Fried was orchestrating a massive, years-long fraud, diverting billions of dollars of the trading platform's customer funds for his own personal benefit and to

---

[1] Bankman-Fried was charged by the Commission on December 13, 2022, in *SEC v. Bankman-Fried*, 22-cv-10501 (S.D.N.Y.).  Ellison and Wang were charged by the Commission on December 21, 2022, in *SEC v. Ellison et al.*, 22-cv-10794 (S.D.N.Y.).  The Court entered consent judgments against Ellison and Wang on December 23, 2022.  As described in paragraph 22, FTX refers to FTX Trading Ltd. and various subsidiary entities, including FTX Digital Markets, a Bahamas company.

help grow his crypto empire.  At various times from May 2019 through November 2022 (the "Relevant Period"), Singh, Ellison, and Wang were active participants in the scheme and engaged in conduct that was critical to its success.

2.      Singh grew up in California and was a childhood friend of Bankman-Fried's brother.  Singh and Bankman-Fried shared a strong interest in a philosophical and social movement known as "effective altruism."  In 2017, Bankman-Fried and Wang founded Alameda Research LLC, a crypto asset hedge fund, and Bankman-Fried invited Singh to assist them with engineering projects.  In December 2017, Singh joined a subsidiary of Alameda full-time as a software engineer.[2]  In or around March 2018, Ellison joined Alameda as a trader, and became Alameda's co-CEO in October 2021.[3]  Singh became the Engineering Manager at Alameda in or around June 2018 and was promoted to Head of Engineering less than a year later.

3.      In or around April 2019, Singh began working with Wang to build FTX, which launched in May of that year.  Although he worked primarily as an FTX engineer beginning in the spring of 2019, Singh retained his role and title as Alameda's Head of Engineering, and continued to work on Alameda projects.  Singh's responsibilities and profile within both Alameda and FTX grew significantly over time, and he ultimately held the role and title of Head of Engineering at both companies.  Wang's title at FTX was Chief Technology Officer.

4.      At both FTX and Alameda, the corporate structure was loose and informal.  While they had different titles and roles, functionally, Singh and Wang were the lead engineers at FTX.  Wang was a talented programmer who directly handled sophisticated coding projects.  Singh continued to work directly on coding as well, but he also managed a group of software engineers

---

[2] As set forth in paragraph 23, Alameda Research LLC and its various subsidiaries, including Alameda Research Ltd. and Alameda Research (Bahamas) Ltd. are referred to collectively herein as "Alameda."
[3] Ellison served as CEO of Alameda Research Ltd. and Alameda Research (Bahamas) Ltd.

to implement high-priority projects at Bankman-Fried's direction.  Singh was a trusted confidant of Bankman-Fried, and, along with Ellison and Wang, was part of Bankman-Fried's inner circle. As a result, Singh's involvement in FTX and Alameda was not limited to engineering and programming.  Singh regularly participated in discussions with Bankman-Fried, Ellison, and Wang about significant strategic and financial decisions that affected both FTX and Alameda.

5.      Bankman-Fried was the public face of FTX and portrayed himself as a responsible leader of the crypto community.  He touted the importance of regulation and accountability.  He told the public, including investors, that FTX was both innovative and responsible.  Customers around the world believed his lies, and sent billions of dollars to FTX, believing their assets were secure on the FTX trading platform.  But the entire time, FTX was improperly diverting customer assets to Alameda.  Wang and Singh created and participated in the creation of the software code that ultimately allowed Alameda to misappropriate FTX customer funds.  Ellison, in turn, used the misappropriated FTX customer funds for Alameda's trading activity, and, later, venture investments.  And Bankman-Fried used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations.

6.      From the inception of FTX in May 2019 until it ceased operations in November 2022, FTX sought to raise billions of dollars from equity investors, including U.S. investors. Bankman-Fried repeatedly cast FTX to investors and the public as an innovative and conservative trailblazer in the crypto markets.  He told investors and prospective investors that FTX had sophisticated automated risk measures in place to protect customer assets, that those assets were safe and secure, and that Alameda was just another platform customer with no special privileges.  Singh, like Ellison and Wang, knew or was reckless in not knowing that these

statements were false and misleading.  In truth, Bankman-Fried, Wang, and Singh, with Ellison's knowledge and consent, had exempted Alameda from the risk mitigation measures and had provided Alameda with significant special treatment on the FTX platform, including a virtually unlimited "line of credit" funded by the platform's customers.

7.     Singh, Ellison, and Wang were all aware of and participated in different aspects of the scheme at different times.  From the inception of FTX, each of them knew or was reckless in not knowing critical facts that made the overall scheme possible, and each came to understand the full scope and extent of the misappropriation of FTX customer funds.  For instance, Singh was aware from the beginning that—despite Bankman-Fried's claims to the contrary—Alameda received special treatment on the FTX platform.  He also became increasingly aware over time that the portrait that Bankman-Fried painted publicly of FTX as a mature, trustworthy company was not accurate, and that Alameda was misappropriating customer funds at Bankman-Fried's direction.

8.     Singh also knew or was reckless in not knowing that, more generally, Bankman-Fried often operated the companies without regard for responsible corporate controls and appropriate conduct.  For example, in late 2021, when Bankman-Fried realized that FTX was $50 million short of his goal of earning one billion dollars in annual revenue, he instructed Singh to transfer funds from another entity that he controlled, and to falsely characterize the $50 million as revenue that FTX earned throughout 2021.  Singh then backdated a series of fraudulent transfers, and later lied to auditors about the transfers and created false documentation to support those lies.  He did so knowing that this information would later also be presented to investors and potential investors.

9.     While Bankman-Fried spent lavishly on office space and condominiums in The

Bahamas, and sank billions of dollars of customer funds into speculative venture investments, his house of cards began to crumble.  When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans.  Despite the fact that Alameda had, by this point, already taken billions of dollars of FTX customer assets, it was unable to satisfy its loan obligations.  Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors.  Ellison then used FTX's customer assets to pay Alameda's debts.  Singh knew or was reckless in not knowing that Alameda was using FTX customer funds for this purpose.

10.     Even as it was increasingly clear that Alameda and FTX could not make customers whole, Bankman-Fried, Singh, Ellison, and Wang continued to misappropriate FTX customer funds.  Through the summer of 2022, Bankman-Fried, with Singh's knowledge, directed hundreds of millions more in FTX customer funds to Alameda, which Bankman-Fried then used for additional venture investments and for "loans" to himself and other FTX executives, including Singh.  And despite his awareness by the summer of 2022 of the dire financial condition of FTX and Alameda, Singh later withdrew millions of dollars using his line of credit from FTX for personal use and expenditures, including a multi-million-dollar house and donations to charitable campaigns.

11.     All the while, Bankman-Fried continued to make misleading statements to investors about FTX's financial condition and risk mitigation measures.  Singh knew or was reckless in not knowing that Bankman-Fried was making these statements, and further knew or was reckless in not knowing that they were false and misleading.  Even in November 2022, faced with billions of dollars in customer withdrawal demands that FTX could not fulfill, Bankman-

Fried and Ellison, with Singh's knowledge and assistance, misled investors from whom they needed money to plug a multi-billion-dollar hole.  This brazen, multi-year scheme finally came to an end when FTX, Alameda, and their tangled web of affiliated entities filed for bankruptcy on November 11, 2022.

## VIOLATIONS

12.     By engaging in the conduct set forth in this Complaint, Defendant violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

13.     Unless Defendant is permanently restrained and enjoined, he will continue to engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

14.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

15.     The Commission seeks a final judgment:  (i) permanently enjoining Defendant from engaging in the acts, practices, transactions and courses of business alleged herein; (ii) ordering Defendant to disgorge his ill-gotten gains and to pay prejudgment interest thereon pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)]; (iii) imposing civil money penalties on Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (iv) imposing an officer and director bar on Defendant pursuant to Section 20(e) of

the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.

§ 78u(d)(2)]; (v) prohibiting Defendant from participating in the issuance, purchase, offer or sale

of any securities, including crypto asset securities, pursuant to Section 21(d)(5) of the Exchange

Act [15 U.S.C. § 78u(d)(5)]; and (vi) ordering such other and further relief the Court may find

appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and

22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27

of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  In connection with the conduct

alleged in this Complaint, Defendant, directly or indirectly, made use of the means or

instruments of transportation or communication in, and the means or instrumentalities of,

interstate commerce, or of the mails.

17.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of

the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Among other acts, false and misleading statements that were part of the fraudulent scheme

alleged herein were made to investors residing in this District.

## DEFENDANT

18.     **Nishad Singh**, age 27, was the Head of Engineering at Alameda and, later, at

FTX.  Singh, a United States citizen, resided in Hong Kong and The Bahamas during the

Relevant Period.

## RELEVANT PARTIES AND ENTITIES

19.     **Samuel Bankman-Fried**, age 30, was a co-founder and majority owner of FTX

and, prior to stepping down on November 11, 2022, its CEO.  He was also a co-founder and

majority owner of Alameda.  He is a United States citizen and resided in Hong Kong and The Bahamas during the Relevant Period.

20.     **Caroline Ellison**, age 28, was employed at Alameda beginning in or around March 2018.  Ellison was the co-CEO at Alameda from in or around October 2021 to in or around August 2022, when she became the sole CEO.  Ellison's employment at Alameda was terminated on or about November 18, 2022.  Ellison, a United States citizen, resided in Hong Kong and The Bahamas during the Relevant Period.

21.     **Zixiao "Gary" Wang**, age 29, was a co-founder and the Chief Technology Officer of FTX and co-founder and 10% owner of Alameda.  Wang's employment at FTX was terminated on or about November 18, 2022.  Wang, a United States citizen, resided in Hong Kong and The Bahamas during the Relevant Period.

22.     **FTX Trading Ltd. (d/b/a FTX.com)** is an Antigua and Barbuda limited corporation.  FTX Trading Ltd. and its subsidiary entities, including FTX Digital Markets (a Bahamas company), are referred to collectively as "FTX."  FTX's principal place of business was in Hong Kong and The Bahamas.  FTX operated a global crypto asset trading platform and began operations in or around May 2019.  FTX was available to customers in most countries, but stated that it would not provide services to customers in the United States and several other countries.  Bankman-Fried and Wang first began developing the FTX platform in 2018.  Singh began working at FTX in April 2019, before the platform launched.  Employees at FTX often referred to Bankman-Fried, Wang, and Singh collectively as the founders of FTX.  On or about November 11, 2022, FTX and certain of its affiliates filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (Bankr. Del.).

23.     **Alameda Research LLC** is a Delaware company that had operations in the

United States, Hong Kong, and The Bahamas.  Alameda Research LLC and its subsidiaries, including Alameda Research Ltd. (a British Virgin Islands company), are collectively referred to herein as "Alameda."  Alameda was a quantitative trading firm specializing in crypto assets (a "crypto hedge fund").  Bankman-Fried and Wang co-founded Alameda in or around October 2017, and, prior to Alameda's bankruptcy filing, had been its sole equity owners, with Bankman-Fried owning 90% and Wang owning 10% of the company.  Bankman-Fried was CEO of Alameda from its inception until in or around October 2021, at which time Ellison and Sam Trabucco ("Trabucco") became co-CEOs.  In or around August 2022, Ellison became the sole CEO.  Alameda has filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (Bankr. Del.).

## FACTS

A.    **Bankman-Fried, Actively Supported by Singh, Wang, and Ellison, Created a Complex Web of Entities, with FTX and Alameda at Its Center.**

24.    In or around October 2017, Bankman-Fried and Wang founded Alameda, a quantitative trading firm specializing in crypto assets.[4]

25.    At inception, Alameda was focused on arbitrage trading strategies, but went on to employ other strategies including market making, yield farming (pooling of crypto assets in exchange for interest or other rewards), and volatility trading.  Alameda also offered over-the-counter trading services, and made and managed other debt and equity investments.

26.    At first, Bankman-Fried was responsible for trading operations, and Wang handled the engineering and programming functions.  Singh joined in December 2017, in part

---

[4] Crypto assets are digital assets reflected or recorded on a cryptographically-secured blockchain.  A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.  Crypto assets may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

because he was interested in working with Bankman-Fried and others at Alameda who were proponents of effective altruism. Bankman-Fried was a prominent supporter of effective altruism, a philosophy that advocates describe as applying data, evidence, and reason to doing the "most good" for society. Bankman-Fried had stated his intention to make a large amount of money and donate it to effective altruism causes. Singh, who was passionate about effective altruism, decided to pursue the same goal by working with Bankman-Fried. Singh's role at Alameda grew quickly, and he became Head of Engineering in or about April 2018.

27.     Over time, Alameda hired additional employees, including Ellison (in or around March 2018) and Trabucco (in or around 2019). By the end of 2021, Alameda had approximately 30 employees.

28.     Bankman-Fried remained the ultimate decision-maker at Alameda, even after Ellison and Trabucco became co-CEOs in or around October 2021. Bankman-Fried directed investment and operational decisions, frequently communicated with Alameda employees, including Ellison, and, like Singh and Wang, had full access to Alameda's records and databases.

29.     Ellison was a trader at Alameda during the time Bankman-Fried acted as CEO. When Ellison became co-CEO in 2021, and continuing through November 2022, Ellison was responsible for Alameda's day-to-day operations. Though Ellison made some trading decisions, she frequently consulted with Bankman-Fried, particularly about strategic issues and significant trades.

30.     In or around 2018, Bankman-Fried began building a crypto asset trading platform, which would eventually become FTX. Singh joined the effort to create FTX in or around April 2019. Singh worked with Wang on the foundational code for FTX. FTX began operations in or around May 2019.

31.    FTX offered its customers a number of services.  For example:

    a.    FTX offered a "spot market," a trading platform through which customers could trade crypto assets with other FTX customers in exchange for fiat currency (*i.e.*, government-issued currency such as U.S. Dollars) or other crypto assets.

    b.    FTX offered "spot margin trading" services, which allowed FTX customers to trade using assets they did not have (*i.e.*, to trade "on margin") by posting collateral in their FTX accounts and borrowing crypto assets through the "spot market" on the FTX platform.  FTX also allowed customers to lend their crypto assets to other FTX customers who would then use those crypto assets to spot trade.

    c.    FTX offered an off-platform (over-the-counter or "OTC") portal that enabled customers to connect and request quotes for spot crypto assets and to conduct trades.

32.    Bankman-Fried was the ultimate decision-maker at FTX from the platform's inception in or around May 2019 until he resigned as CEO on or about November 11, 2022. Wang and Singh were the lead engineers responsible for writing the software code for FTX, including the code that allowed for the services described above.

33.    In 2019, seeking to avoid United States regulatory requirements, including the requirements of the United States securities laws, Bankman-Fried and Wang moved to Hong Kong.  Ellison joined Bankman-Fried, Wang, and others in Hong Kong in November 2019, and Singh moved to Hong Kong in 2020.  In Hong Kong, FTX and Alameda shared office space, employees, and other resources.  In November 2021, both FTX and Alameda relocated to The

Bahamas. The two companies continued to share office space, employees, and resources. Moreover, Bankman-Fried, Ellison, Singh, Wang, and other employees lived together in a luxury penthouse apartment in The Bahamas.

34.     Both Wang and Singh continued to take direction from Bankman-Fried regarding high-priority projects. Wang, the Chief Technology Officer of FTX, often handled the more technical and difficult coding projects, while Singh, the Head of Engineering, often handled project management and personnel issues within the engineering team as well as various coding projects. As FTX grew, additional engineers joined the company, and Singh eventually managed approximately 20 engineers. Because of his close relationship with Bankman-Fried, and Singh's own interpersonal skills, FTX employees often viewed Singh as a conduit to Bankman-Fried. Moreover, as a general matter, Singh, Ellison, and Wang comprised Bankman-Fried's inner circle, and were involved in discussions outside of their official roles and responsibilities at the companies. Each of them was also a proponent of effective altruism, and/or worked on projects related to that cause.

35.     At both Alameda and FTX, at Bankman-Fried's direction, most company communications occurred using the office messaging service Slack or the encrypted messaging application Signal. Employees understood from Bankman-Fried that communications should not be retained, and most messages were set by default to auto-delete after a limited period. Communications on critical strategic issues were often shared in restricted group messaging channels or chats that were named to indicate specific participants or topics. Singh participated in many of the most important channels or chats at FTX, generally with Bankman-Fried, Wang, Ellison, and other key employees, both individually and in small groups (*e.g.*, a Signal chat named "SBF Caroline Nishad"). Some of these chats were focused on particular high-priority

issues, including Signal chats with names such as "PR super sensitive" and "#private-alameda-ftx."

36.    In or around January 2020, Bankman-Fried, Wang, and Singh founded FTX US, a crypto asset trading platform designed primarily for customers in the United States.[5]

37.    Over time, Bankman-Fried expanded his holdings to include a number of companies focused on making and managing private (or "venture") investments.

38.    This interconnected web of companies grew to include over 100 separate entities, with Bankman-Fried at the top and Alameda, his crypto hedge fund, at the center.

39.    Throughout the Relevant Period, in multiple public statements, Bankman-Fried held himself out as a visionary leader in the crypto industry, and touted his efforts to create a regulated and thriving crypto asset market.  He conducted an intensive public relations campaign to brand himself and his companies as honest stewards of crypto.

40.    The reality was very different:  From the start, contrary to what FTX investors and trading customers were told, Bankman-Fried diverted FTX customer funds to Alameda and then used those funds to continue to grow his empire, using billions of dollars to make undisclosed private venture investments, political contributions, and real estate purchases. Ultimately, Singh, Ellison, and Wang all supported aspects of Bankman-Fried's scheme and participated in the use of FTX customer funds for these purposes.

41.    At the same time, throughout the Relevant Period, Bankman-Fried, with Singh, Ellison, and Wang's knowledge, solicited equity investors by touting FTX's controls and risk management, ultimately raising at least $1.8 billion from investors in exchange for various classes of stock in FTX through multiple fundraising rounds, including raising:

---

[5] FTX US is the d/b/a for a subsidiary of West Realm Shires Inc., a separate legal entity from FTX Trading Ltd. that provided different services.  FTX US's conduct is not the subject of the allegations in this complaint.

(1) approximately $8 million from the sale of shares of FTX Series A preferred stock, with fundraising completed in or around August 2019; (2) approximately $1 billion from the sale of shares of FTX Series B preferred stock, with fundraising completed in or around July 2021; (3) approximately $420 million from the sale of shares of FTX Series B-1 stock, with fundraising completed in or around October 2021; and (4) approximately $500 million from the sale of shares of FTX Series C stock, with fundraising completed in or around January 2022.  Of this total, approximately $1.1 billion was invested in FTX by approximately 90 investors based in the United States.  Bankman-Fried continued to offer FTX securities to investors, including U.S. investors, in the summer and fall of 2022.

42.     For the entire span of the Relevant Period, while raising money from equity investors, Bankman-Fried and those speaking at his direction and on his behalf, with Singh's knowledge, claimed in widely distributed public forums and directly to investors that:  FTX was a safe crypto asset trading platform; FTX had a comparative advantage due to its automated risk mitigation procedures; and FTX and its customers were protected from other customers' losses due to FTX's automated liquidation process.  As discussed further herein, these statements and others were misleading in light of Bankman-Fried's failure to disclose to FTX investors the diversion of FTX customer funds to Alameda, which he then used for his own purposes, including loans to himself.  Similarly, Bankman-Fried's statements concerning the separation of FTX and Alameda, made throughout the Relevant Period, were misleading because he did not disclose, among other things, the special treatment afforded to Alameda on FTX, including its virtually unlimited "line of credit" at FTX, its ability to carry a negative balance in its FTX customer account, and its exemption from FTX's automated liquidation process.  No other customer on the platform enjoyed these special privileges, which changed the risk profile of FTX

as an investment.  Singh, Wang, and Ellison were aware of the diversion of FTX customer funds to Alameda and of the special treatment afforded to Alameda, and they were aware that Bankman-Fried was making false or misleading statements in order to raise money for FTX from equity investors.

43.     Singh participated in meetings with certain investors in which false and misleading statements were made.  He also participating in preparing financial documents that he knew would be provided to investors, and knew or was reckless in not knowing that these documents contained information that was false and/or materially misleading.

44.     Bankman-Fried also misrepresented the risk profile of investing in FTX by failing to disclose FTX's exposure to Alameda and, relatedly, that the collateral Alameda deposited on FTX consisted largely of illiquid, FTX-affiliated tokens, including FTT, a crypto asset security that was issued by FTX and provided to Alameda at no cost.  Moreover, Bankman-Fried failed to disclose that Ellison, at his direction, caused Alameda to borrow billions of dollars from third-party lenders, backed in significant part by Alameda's FTT holdings.

45.     In addition to these material omissions, Bankman-Fried also made material misrepresentations to FTX investors about FTX's risk management and its relationship with Alameda.  As detailed below, Bankman-Fried made these material misstatements throughout the Relevant Period, and the entire time he was raising or attempting to raise funds for FTX—from the time FTX began operations in May 2019 through it ceased operations in November 2022. Again, Singh, among others, knew or was reckless in not knowing that Bankman-Fried was making these false or misleading statements and that he was doing so in order to raise money from equity investors.

**B.     Alameda Was Used to Carry Out the Fraudulent Scheme.**

46.     Alameda (including its many subsidiaries) served a number of essential functions

in Bankman-Fried's growing web of companies.  For example, Alameda was the primary market maker on FTX at the time of FTX's inception in 2019.  In this capacity, Alameda, at Bankman-Fried's direction, was tasked with creating liquidity on FTX to allow the platform to function more efficiently.  Bankman-Fried also made venture investments through an Alameda subsidiary.  Most crucially, Bankman-Fried used Alameda to house FTX customer assets and to deploy those assets, under Bankman-Fried's direction, to help grow his empire.

47.     From the inception of FTX, Bankman-Fried diverted FTX customer funds to Alameda, and continued to do so until FTX's collapse in November 2022.

48.     FTX diverted customer funds to Alameda in essentially two ways:  (1) by directing FTX customers to deposit fiat currency (*e.g.*, U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw down from a virtually limitless "line of credit" at FTX, which was funded by FTX customer assets.

49.     As a result, there was no meaningful distinction between FTX customer funds and Alameda's own funds.  Alameda therefore effectively had *carte blanche* to use FTX customer assets for Alameda's trading operations and for whatever other purposes Bankman-Fried and Ellison saw fit.

50.     In essence, FTX placed billions of dollars of its customer funds into Alameda. Bankman-Fried then used Alameda as his personal piggy bank to buy luxury condominiums, support political campaigns and causes, and make private investments, among other uses. Ellison used these funds for Alameda's operations, including speculative trading strategies and servicing Alameda's debt to third-party lenders.  Singh, Ellison, and Wang were aware of the diversion of FTX customer funds to Alameda and the above-described uses of those funds, and

they knew that none of this was disclosed to FTX equity investors or to the platform's trading customers.

51.     From the inception of FTX, Singh knew that Alameda had a special role, and received special treatment, on the platform.  Specifically, he was aware that Alameda used FTX customer fiat currency for its own trading purposes.  He also knew that, as a result of its trusted relationship with FTX, Alameda was allowed to bypass certain security measures when accessing the FTX platform, allowing it to do so more quickly than other customers.[6]  Singh also knew that Alameda obtained an additional speed advantage over other customers because it could engage in transactions on the FTX platform without collateral verifications that other customers were required to pass before a transaction would be processed.  Moreover, Singh knew that Bankman-Fried sometimes required Alameda to receive unfavorable treatment on the platform, when Bankman-Fried thought that doing so would present a better overall picture of FTX's financial health.  Singh, along with Wang and Ellison, knew that this special relationship was not disclosed to FTX equity investors or customers.  Ultimately, Singh came to understand in or around the summer of 2022 that, in addition to the special privileges and relationship described above, Alameda's misappropriation of FTX customer funds had grown to billions of dollars.

      **i.**    **FTX Customers Deposited Billions of Dollars into Alameda-Owned Bank Accounts, and Alameda Spent the Money on Its Own Trading Operations and to Expand Bankman-Fried's Empire.**

52.     From the start of FTX's operations in or around May 2019 until at least 2021, FTX customers deposited billions of dollars in fiat currency into bank accounts controlled by

---

[6] At a later point, other FTX customers were also provided trusted, faster access.

Alameda.  Singh and others were aware that Alameda was receiving FTX customer funds in this manner.

53.     At least some of these bank accounts were not in Alameda's name, but rather in the name of North Dimension Inc. ("North Dimension"), an Alameda subsidiary.  Singh created the website for North Dimension, which did not disclose any connection to Alameda.  Singh knew or was reckless in not knowing that Bankman-Fried had directed FTX to have customers send funds to North Dimension in an effort to hide the fact that the funds were being sent to an account controlled by Alameda.

54.     Alameda did not segregate these customer funds, but instead commingled them with its other assets and used them indiscriminately to fund its trading operations and Bankman-Fried's other ventures.

55.     This multi-billion-dollar liability was reflected in an internal account in the FTX database that was not tied to Alameda but was instead called "fiat@ftx.com."  Characterizing the amount of customer funds sent to Alameda as an internal FTX account had the effect of concealing Alameda's liability in FTX's internal systems.  Singh knew that FTX customer funds were being sent to Alameda-controlled bank accounts and that Alameda's liability was reflected in the "fiat@ftx.com" account.  Alameda was not required to pay interest on the liability reflected in the "fiat@ftx.com" account.

56.     In or around mid-2022, FTX began trying to separate Alameda's portion of the liability in the "fiat@ftx.com" account from the portion that was attributable to FTX (*i.e.*, to separate out customer deposits sent to Alameda-controlled bank accounts from deposits sent to FTX-controlled bank accounts).  Singh was integral to this project and oversaw the work of other software engineers who were contributing to the effort.  Alameda's portion of the liability—

which amounted to more than $8 billion in FTX customer assets that had been deposited into Alameda-controlled bank accounts—was initially moved to a different account in the FTX database. However, because this change caused FTX's internal systems to automatically charge Alameda interest on the more than $8 billion liability, Singh was directed to move the Alameda liability to an account that would not be charged interest. This account was associated with an individual that had no apparent connection to Alameda. As a result, this change had the effect of further concealing Alameda's liability in FTX's internal systems.

> **ii.   The FTX Platform, By Design, Granted Special Treatment to Alameda, Including Features that Allowed Alameda to Divert FTX Customer Assets.**

57.     In addition to receiving cash deposits directly from FTX customers, Alameda benefited from undisclosed features of the FTX platform, which were embedded in software code developed by Wang and Singh, and which allowed Alameda to divert FTX customer assets. For example:

a.   *Negative Balance*:  Alameda was able to maintain a negative balance in its customer account at FTX. Bankman-Fried directed FTX engineers, including Wang and Singh, to write software code in or around August 2019, and to update it in or around May 2020, ultimately allowing Alameda to maintain a negative balance in its account, untethered from any collateral requirements. Only Alameda and a small number of other accounts also controlled by Bankman-Fried were permitted to maintain a negative balance.

b.   *Line of Credit*:  Bankman-Fried directed FTX engineers, including Wang and Singh, to give an unofficial "line of credit" to Alameda, allowing Alameda to draw down on its FTX customer account and use those funds—which were actually the funds deposited by *other* FTX customers—for its own trading and

investments.  At Bankman-Fried's direction, Wang and Singh repeatedly raised

the limit on Alameda's "line of credit" to the point where it grew to more than

$65 billion dollars and effectively became limitless.  No other FTX customer had

a similar "line of credit."

c.  *Liquidation Exemption*:  In or around May and August 2020, Bankman-Fried

directed FTX engineers, including Wang and Singh, to exempt Alameda from the

"auto-liquidation" feature of FTX's spot margin trading services.  As a result,

Alameda's collateral could fall below the requisite margin levels without

triggering the automatic liquidation of its account.  Alameda was the only

customer exempted entirely from FTX's automatic account liquidation.

58.     When Singh and Wang initially created the code described above, it was not with

the goal of enabling Alameda to misappropriate FTX customer assets from the FTX platform.

For example, the code that Singh created allowing accounts to carry a negative balance was

initially applied to non-trading accounts, to reflect money owed to FTX.  Some of the code

provisions described above may also have ultimately been redundant, providing alternate ways

for Alameda to withdraw customer assets from the FTX platform.  However, as a whole, the

code described above, which was created by Singh and Wang at Bankman-Fried's direction, is

what collectively allowed Alameda's unfettered withdrawals from the FTX platform to occur.

Over time, Singh became aware of how these privileges were being applied to Alameda's trading

accounts and that Alameda was taking advantage of these privileges, at Bankman-Fried's

direction, to draw on FTX customer assets to a virtually unlimited extent for its own uses.

### iii.    In 2022, Alameda Diverted Billions More in FTX Customer Assets.

59.     Starting in or around 2021, Bankman-Fried directed Ellison to have Alameda

borrow billions of dollars from third-party crypto asset lending firms in order to fund Bankman-

Fried's venture investments and for his personal use.  Certain of these loans included provisions permitting the lenders to demand repayment at any time.

60.  In or around May 2022, as prices of crypto assets were dropping precipitously, several of Alameda's lenders demanded repayment.  Because Alameda did not have sufficient assets to cover all of these obligations, Bankman-Fried directed Ellison to draw on Alameda's "line of credit" from FTX, which, based on the software code that Wang and Singh had previously created, allowed Alameda to borrow virtually limitless funds from FTX.  Billions of dollars of FTX customer funds were thus diverted to Alameda and used by Alameda to repay its third-party loan obligations.

61.  Because Alameda now had billions of dollars more in liability to FTX (on top of the billions of dollars reflected in the "fiat@ftx.com" account), Bankman-Fried—concerned that this enormous liability would alarm Alameda's lenders—directed Ellison to hide this "line of credit" in Alameda's balance sheet.  Ellison did so and presented this information to lenders, knowing that it was materially misleading.

62.  Despite the fact that Alameda now owed FTX billions of dollars with no immediate prospects of raising capital to pay off its "line of credit," Bankman-Fried continued to direct Ellison to draw on the Alameda "line of credit" in the summer of 2022.  The customer funds diverted to Alameda were used, among other things, to provide hundreds of millions of dollars in "loans" to Bankman-Fried and other FTX executives, including Singh, as well as hundreds of millions more to fund additional venture investments.

> **iv.  Bankman-Fried, Supported by Singh, Assured Investors that FTX Customer Assets Were Secure, and Hid Alameda's Close Relationship with FTX.**

63.  Throughout the Relevant Period, Bankman-Fried was directly involved in soliciting potential investors in FTX.  Bankman-Fried met, and otherwise communicated with,

FTX investors, including investors based in the United States.  Along with another FTX

employee, Bankman-Fried was the point person for investor relations at FTX.  Singh knew that

Bankman-Fried was meeting with and soliciting funds from equity investors.  At times, Singh

also met with investors or provided others with information and materials to share with investors.

64.     FTX's Terms of Service, which were publicly available on FTX's website and

accessible to investors, assured FTX customers that their assets were secure, providing:  "you

control the Digital Assets held in your Account;" "[t]itle to your Digital Assets shall at all times

remain with you and shall not transfer to FTX;" and "none of the digital assets in your account

are the property of, or shall or may be loaned to, FTX Trading."[7]  The Terms of Service further

provided:  "Once we receive fiat currency we may issue you an equivalent amount of electronic

money ("E-Money")…which represents the fiat currency that you have loaded," and "[y]ou may

redeem all or part of any E-Money held in your Account at any time."

65.     Similarly, FTX posted on one of its websites a document entitled, "FTX's Key

Principles for Ensuring Investor Protections on Digital-Asset Platforms," in which FTX

represented that it "segregates customer assets from its own assets across our platforms."  FTX

further represented in that document that it maintained "liquid assets for customer

withdrawals…[to] ensure a customer without losses can redeem its assets from the platform on

demand."

66.     In addition to making this document available to the public, FTX provided it to

potential investors, including a U.S. investor who had invested $35 million in FTX's Series B

fundraising round in July 2021.  As described above, these statements to the public, customers,

---

[7] These Terms of Service, dated May 2022, also referenced customers lending and borrowing their assets on the platform in connection with margin trading, but did not disclose that FTX's affiliate (Alameda) could use FTX customer assets indiscriminately for any purpose.

and investors were false—FTX did not segregate its customer assets from its own assets, and, as events would later demonstrate, did not maintain sufficient liquidity to allow customer withdrawals on demand.

67.    FTX investors were also provided with FTX's audited financial statements, and FTX represented in its purchase agreements that those financial statements "fairly present in all material respects the financial condition and operating results of" FTX.  These audited financial statements, which did not include information about Alameda's undocumented "line of credit" from FTX and other information discussed herein, were materially misleading.  Moreover, Singh, at Bankman-Fried's direction, backdated transactions in order to inflate FTX's 2021 revenue by more than $50 million.  Singh then presented false documentation of those transactions to FTX's auditor, and when he spoke to the auditor, he lied about the nature and timing of the transactions.

68.    Throughout the Relevant Period, Bankman-Fried made statements assuring the public that customer assets were safe at FTX.  For example, he stated in a tweet on or about June 27, 2022:  "Backstopping customer assets should always be primary.  Everything else is secondary."  He likewise tweeted on or about August 9, 2021:  "As always, our users' funds and safety comes first.  We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

69.    Bankman-Fried also told investors, and directed other FTX and Alameda employees to tell investors, that Alameda received no preferential treatment from FTX.  For example, Bankman-Fried told the Wall Street Journal in or around July 2022:  "There are no parties that have privileged access."  Likewise, in a Bloomberg article published in or about September 2022, Bankman-Fried claimed that "Alameda is a wholly separate entity" from FTX.

In the same article, Ellison is quoted as stating about Alameda:  "We're at arm's length and don't get any different treatment from other market makers."  Similarly, in an interview in or about August 2022, Ellison claimed that FTX and Alameda were separate companies, that Alameda received no special treatment on the FTX platform, and that there was an ethical wall between them preventing sharing of customer information between FTX and Alameda.  Bankman-Fried made similar statements directly to investors.

70.     Singh was aware of the substance of Bankman-Fried's statements about FTX customer assets—including the security of the assets and the manner in which they would be handled—and about the relationship between Alameda and FTX.  Singh further knew or was reckless in not knowing that these statements to equity investors, customers, and the public were false and misleading, and that they were important to FTX's investors.  Singh likewise knew or was reckless in not knowing that these statements were intended to make FTX more attractive to investors and potential investors.

### C.     Singh Knew that FTX Had Poor Controls and Deeply Inadequate Risk Management Procedures, in Stark Contrast to Bankman-Fried's Claims that It Was a Mature, Conservative Company.

71.      From its inception, FTX had poor controls and fundamentally deficient risk management procedures.  Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Alameda, FTX, and executives, including Bankman-Fried, Wang, and Singh.  This reality was in sharp contrast to the image of FTX that Bankman-Fried consistently portrayed to the public and to investors—a mature company that managed funds and risk in a conservative, rigorous manner.

72.     FTX invested significant resources to develop and promote its brand as a trustworthy company.  For example, in materials provided to one investor in or around June

2022, FTX cultivated and promoted its reputation:

> FTX has an industry-leading brand, endorsed by some of the most
> trustworthy public figures, including Tom Brady, MLB, Gisele
> Bundchen, Steph Curry, and the Miami Heat, and backed by an
> industry-leading set of investors.  FTX has the cleanest brand in
> crypto.

73.     FTX also promoted itself as a company that was willing to work collaboratively

with regulators and lawmakers.  In the same materials, FTX claimed:  "FTX is also the only

major digital asset venue to maintain positive, constructive relationships with regulators and

lawmakers."

74.     Singh knew or was reckless in not knowing that the reality was far different from

what Bankman-Fried presented to FTX's investors and customers.  During the course of his time

at FTX, Singh became increasingly concerned about the manner in which FTX operated,

including the ambitious projects undertaken without sufficient resources, all while spending

lavishly on marketing, endorsements, and acquisitions, some of which Singh opposed.  Singh's

concerns stemmed in part from his awareness of Alameda's significant liability to FTX, and the

illiquid assets Alameda carried on its balance sheet that would potentially endanger the financial

stability of both Alameda and FTX.  Nevertheless, despite these concerns, Singh continued to

work at FTX and to support Bankman-Fried.

### i.    The FTX Automated Risk Engine

75.     Bankman-Fried repeatedly touted FTX's automated risk mitigation protocols—

which he called FTX's "risk engine"—to the public and prospective investors as a safe and

reliable way for crypto asset trading platforms to manage risk.  FTX engineers, including Wang

and Singh, developed the software code that created the "risk engine."  In essence, the software

code implemented a series of rules that were designed to reduce risk to the platform posed by an

individual client's account by automatically triggering certain actions (*e.g.*, to sell collateral in an account when an account was overly extended).

76.     Bankman-Fried promoted the concept of "24/7" automated risk monitoring as an innovative benefit of crypto asset markets, including at a hearing before the U.S. House of Representatives Committee on Financial Services on or about December 8, 2021, where Bankman-Fried concluded his remarks by stating:

> And the last thing I will say is if you look at what precipitated some of the 2008 financial crisis, you will see a number of bilateral, bespoke, non-reported transactions happening between financial counterparties, which then got repackaged and releveraged again and again and again, such that no one knew how much risk was in that system until it all fell apart.  If you compare that to what happened on FTX or other major cryptocurrencies in use today, there is complete transparency about the full open interest.  There is complete transparency about the positions that are held.  There is a robust, consistent risk framework applied.

77.     In addition to generally promoting the benefits of automated risk engines, Bankman-Fried repeatedly claimed that FTX's own risk engine was especially sophisticated and carefully calibrated.

78.     FTX also highlighted the benefits of its risk engine in written materials provided to investors and prospective investors.  In the fall of 2022, for example, the company pointed to its risk engine as a competitive advantage:   "FTX's risk engine has been operating 24/7/365, in real time, since launch."  FTX claimed that "[u]nlike almost any other models," the FTX risk engine offered a variety of features including "[i]nsulat[ing] users from the risk management of any other counterparties by custodying collateral."  In the same document, FTX emphasized the safety and security of customer assets, stating, "We have custodied tens of billions of dollars of assets globally with no significant security incidents, customer losses, or wallet downtime." FTX shared this and other documents with investors and prospective investors in an online file

sharing location (a "data room" or "data center").  FTX began maintaining this data room continuously in or around July 2021, which allowed FTX to share documents with investors and prospective investors who were conducting due diligence during FTX's various fundraising rounds.

79.     Investors were interested in the FTX risk engine and Bankman-Fried's representations about how it worked.  In a communication with an investor in late June 2022, FTX highlighted the engine as a key "competitive edge," claiming "FTX's risk and liquidation engine are well-designed and extremely user friendly."  The information FTX provided about risk management and controls, and the automatic liquidation engine generally, was important to prospective investors.

80.     The above-described statements about FTX's risk engine were materially false and misleading because of a critical omission:  Bankman-Fried did not reveal that the automatic risk engine did not apply to the accounts of its most important customer—Alameda.  As discussed above, Wang and Singh had created a series of special features in the software code that exempted Alameda from the rules of the "risk engine."  This was a critical special benefit that Bankman-Fried and FTX afforded Alameda:  Alameda's collateral on deposit was allowed to fall below FTX's required margin level without FTX liquidating any part of Alameda's portfolio.

81.     Singh knew or was reckless in not knowing that Bankman-Fried's statements regarding FTX's risk engine misled FTX's investors by representing that its risk engine would protect FTX customer funds and would limit FTX's exposure to any single customer, while failing to disclose that Bankman-Fried had directed Wang and Singh to ensure that the engine did not apply to one of its largest customers, which was also the platform's largest market maker.

82.     As Bankman-Fried acknowledged in a network television interview on or about

December 1, 2022:  "I wasn't even trying, like, I wasn't spending any time or effort trying to

manage risk on FTX."  Bankman-Fried continued:  "What happened, happened—and, if I had

been spending an hour a day thinking about risk management on FTX, I don't think that would

have happened."

<strong>ii.     The Valuation of Alameda's Collateral</strong>

83.     Alameda's collateral consisted largely of enormous positions in illiquid crypto

assets issued by FTX and Bankman-Fried (including FTT, the "exchange token" for FTX, as

described below), compounding the undisclosed risk to FTX's investors.

84.     FTX valued Alameda's FTX-affiliated tokens at market prices, but the collateral

held by Alameda was not worth the value assigned to it.  Alameda and FTX collectively owned

the majority of these tokens, and only a small portion of the FTX-affiliated tokens were in

circulation.  As such, the tokens were illiquid, and, Singh, Bankman-Fried, and others knew or

were reckless in not knowing—based in part on their significant experience in crypto asset

trading markets—that if Alameda or FTX tried to sell Alameda's holdings, market prices for the

tokens would fall, thereby driving down the value of Alameda's remaining assets.  As a result,

even if FTX had liquidated Alameda's portfolio, the sales of those thinly traded tokens would not

have generated sufficient funds to cover the amount Alameda had withdrawn from FTX.

85.     Singh, Bankman-Fried, and others were well aware of the impact of Alameda's

positions on FTX's risk profile.  On or about October 12, 2022, for example, Bankman-Fried, in

a series of tweets, analyzed the manipulation of a digital asset on an unrelated crypto platform.

In explaining what occurred, Bankman-Fried distinguished between an asset's "current price"

and its "fair price," and recognized that "large positions – especially in illiquid tokens – can have

a lot of impact."  Bankman-Fried asserted that FTX's risk engine required customers to "fully

28

collateralize a position" when the customer's position is "large and illiquid enough."  But Bankman-Fried knew, or was reckless in not knowing, that by not mitigating the impact of large and illiquid tokens posted as collateral by Alameda, FTX was engaging in precisely the same conduct, and creating the same risk, that he was warning against.  Singh likewise knew that Alameda was drawing down on a virtually unlimited line of credit from FTX, purportedly backed by what he knew or was reckless in not knowing were large stakes in illiquid assets.

86.     The reality of FTX's exposure to the risk created by the valuation of Alameda's positions stood in stark contrast to Bankman-Fried's assertions about risk management at FTX in his October 2022 Twitter analysis, in which he described FTX's approach and claimed that constructing the rules for FTX's risk engine in a manner that is "conservative, and handles apparent large moves gracefully" is "probably the most important thing we do at FTX." Bankman-Fried further claimed, contrasting FTX to the failed endeavor:  "There are a bunch of other risk engine protection and sanity checks, too, which would have caught something like this."

87.     Not only did Bankman-Fried fail to tell investors that he had exempted Alameda from FTX's risk engine, he also falsely told certain investors that FTX had no exposure to FTT at all.  In late summer 2021, for example, Bankman-Fried told a potential U.S. investor in FTX's Series B fundraising round that FTX did not hold FTT and, consequently, the investor would not have any exposure to FTT.  The investor ultimately invested $30 million.  For the reasons described above, Bankman-Fried knew or was reckless in not knowing that at the time that he made those representations, they were false and misleading.  Specifically, Bankman-Fried knew or was reckless in not knowing that any investment in FTX carried significant exposure to FTT, as the token was one the largest assets Alameda held, and Alameda owed FTX billions of dollars.

88.     Singh knew or was reckless in not knowing that Bankman-Fried was making false and misleading representations to investors about FTX's exposure to large positions in illiquid crypto assets issued by FTX and Bankman-Fried.

### iii.     Bankman-Fried Schemed with Singh To Inflate FTX's Revenues in FTX's Audited Financial Statements Provided to Investors.

89.     In late 2021, Bankman-Fried learned that FTX's revenue for 2021 would be approximately $950 million.  He told Singh and others that he wanted to publicly tout FTX's revenue for the year as exceeding $1 billion.  Bankman-Fried further intended to provide audited financial statements for 2021 to potential investors demonstrating that FTX's revenue in fact exceeded $1 billion.

90.     To close the $50 million revenue gap, Bankman-Fried hatched a scheme to have an entity that he controlled make backdated payments to FTX, so that FTX could falsely claim that these payments constituted revenue earned throughout the course of 2021.  Specifically, Bankman-Fried controlled EcoSerum, which was part of Project Serum—a financial platform on the Solana blockchain.  Serum tokens (also referred to as SRM) were a part of the Serum ecosystem, and customers could earn rewards for "staking" their SRM.[8]  FTX also offered a similar rewards structure for its customers holding SRM, with EcoSerum paying out the rewards to FTX customers.  In December 2021, Bankman-Fried decided that in order to claim that FTX had generated an additional $50 million over the course of the past year, he would make it appear that EcoSerum had actually been paying FTX a commission in connection with FTX customers "staking" their SRM.  To accomplish this, Bankman-Fried instructed Singh to transfer more than

---

[8] Project Serum's website described "staking" in this context as "the process by which you can temporarily lock up your tokens in exchange for a protocol-specific reward"—in this case, four percent in additional SRM rewards per year.  Internally within FTX and externally in the broader crypto community, SRM was among several tokens referred to as "Sam Coins," *i.e.*, crypto assets associated with Bankman-Fried.

$50 million from EcoSerum's account on FTX to an FTX-controlled account in a series of

backdated installments designed to make it appear as though EcoSerum had been paying FTX

regularly throughout 2021.  Bankman-Fried then signed a contract in which FTX claimed it was

to receive monthly payments throughout 2021 equal in value to 25 percent of all SRM rewards

that had been distributed to FTX customers.  The 25 percent commission was, according to

Singh's calculations at the time, sufficient to cover the $50 million revenue gap.

91.     Singh then knowingly provided this false information, along with false

documentation of EcoSerum payments to FTX, to FTX's auditor, resulting in the inflation of

FTX's 2021 revenue by more than $50 million in FTX's audited financial statements.  Singh

further knew that Bankman-Fried and others provided these audited financial statements, based

on falsified information, to investors, including investors in the United States.

### iv.     Loans to FTX Executives and Real Estate Purchases

92.     The FTX funds transferred to Alameda were used not only for Alameda's

proprietary trading, but also to fund loans to FTX executives, including Bankman-Fried himself,

and to fund personal real estate purchases.  Between March 2020 and September 2022,

Bankman-Fried executed promissory notes for loans from Alameda totaling more than $1.338

billion, including at least two instances in which Bankman-Fried was both the borrower in his

individual capacity and the lender in his capacity as CEO of Alameda.

93.     Bankman-Fried also used commingled funds from Alameda to make large

political donations and to purchase tens of millions of dollars in Bahamian real estate for himself,

his parents, and other FTX executives.

94.     In 2020 and 2021, Singh executed promissory notes with Alameda totaling

approximately $577.5 million.  The funds borrowed under the promissory notes (referred to

internally at FTX as "Founders Loans") in Singh's name were generally not intended for Singh's

personal use but were instead used by Bankman-Fried for other purposes, including additional

venture investments and acquisitions.  Singh also borrowed millions to donate to political

campaigns and causes, as well as philanthropic causes associated with effective altruism.  Some

of these donations were funded through a line of credit that Bankman-Fried authorized Singh to

provide himself on his personal FTX account.  In 2021, Singh also borrowed $10 million in an

undocumented loan and provided the funds to friends and family.  This enabled Singh to make

donations and expenditures without having to sell his FTT tokens, which Bankman-Fried

instructed him to hold to avoid downward pressure on the price of FTT.

95.     Moreover, in September and October of 2022, when Singh was already aware that

FTX customer funds had been used by Alameda and that Alameda was unable to repay the debt,

Singh withdrew approximately $6 million from FTX for personal use and expenditures,

including the purchase of a multi-million-dollar house and donations to charitable causes.

96.     The loans to Bankman-Fried, Singh, and other individuals were often poorly

documented, and at times not documented at all.  Similarly, the record keeping regarding the

purchase and ownership of real estate was poorly organized and documented.  Singh knew or

was reckless in not knowing that neither the fact of the loans and purchases, nor the poor

documentation of significant company liabilities and expenditures, was disclosed to investors.

### D.   Despite the Precarious Financial Position of FTX and Alameda, Bankman-Fried, Singh, Wang, and Ellison Continued to Use FTX Customer Assets in the Summer of 2022.

97.     In May 2022, prices in the crypto markets plummeted due to a significant loss in

value of certain crypto assets and networks, and the collateral effects on the interrelated markets.

Bankman-Fried characterized FTX, and himself, as playing an important role in stabilizing the

industry.  Bankman-Fried entered into a series of transactions with other members of the

industry, providing credit to and taking over other failing firms.  On or about June 21, 2022, after

giving a $250 million line of revolving credit to BlockFi, a global crypto financial services company, to provide the company with access to capital to ease liquidity concerns, Bankman-Fried tweeted: "We take our duty seriously to protect the digital asset ecosystem and its customers."

98.     At the same time that Bankman-Fried was positioning himself as a hero in the industry, however, the plummeting value of crypto assets was impacting Alameda, and as a result, impacting FTX.  As discussed above, as a result of the same market conditions impacting BlockFi's liquidity, many of Alameda's lenders demanded repayment of loans they had made to Alameda.  Ellison, at the direction of Bankman-Fried, drew down billions of dollars from FTX to repay some of Alameda's loans.

99.     Thus, in the summer of 2022, Singh, Bankman-Fried, and others knew or were reckless in not knowing that FTX was in a precarious financial condition.  By that time, Alameda had taken billions from FTX through spending customer fiat deposits and withdrawing customer assets from the platform.  Singh discussed his concerns about the magnitude of this liability and potential effect on the solvency of FTX with Bankman-Fried and others.  Based on further conversations with Ellison, Wang, Bankman-Fried, and others, Singh harbored doubts that Alameda would be able to replace the assets that it had misappropriated.

100.    Nonetheless, Bankman-Fried and Ellison, with the knowledge of Wang and Singh, continued to spend hundreds of millions of dollars to purchase and support other crypto companies, and allowed Alameda to use FTX customer funds to repay its debts.  In addition, Bankman-Fried, Singh, Wang, and other FTX executives continued to withdraw customer funds in the form of the poorly documented and undisclosed "loans" described above.  Moreover, Singh and Bankman-Fried knew or were reckless in not knowing that these loans were funded

with customer assets that Alameda withdrew from the FTX platform.  Collectively, the actions of Bankman-Fried, Wang, Singh, and Ellison in the summer of 2022 further imperiled FTX's financial condition.

101.    Singh knew or was reckless in not knowing that Bankman-Fried continued to present a false and misleading positive account of FTX to investors, despite FTX's tenuous financial condition at this time.  In a meeting with FTX's U.S. investors in September 2022, for example, an FTX presentation included the claim that:  "Outside of BlockFi, we didn't increase our exposure to crypto."  This statement was false and misleading:  the customer funds that FTX diverted to Alameda, including customer funds that Ellison used to repay Alameda's lenders, were collateralized in part by Alameda's FTT holdings.  Singh, Ellison, Wang, and Bankman-Fried knew or were reckless in not knowing that, as a result, FTX's exposure to crypto, including its own FTT token, increased substantially as Alameda increased its borrowing, backed in part by FTT as collateral, in the second quarter of 2022.

102.    In that same meeting with investors, FTX also represented that certain investments did not involve the assets of FTX or its customers.  Contrary to that representation, two $100 million investments made by FTX's affiliated investment vehicle, FTX Ventures Ltd., were funded with FTX customer funds that had been diverted to Alameda.

103.    Singh also knew or was reckless in not knowing that FTX continued to falsely claim to investors and prospective investors that it was a wholly separate entity from Alameda. For instance, in late September 2022, in advance of a due diligence call with a U.S. investor, FTX provided the investor a document that included the following question:  "What is the nature of interaction between Alameda and FTX?  Is there any relationship other than as a market maker and exchange?"  FTX falsely responded:  "Alameda and FTX are two separate entities,

with the same majority UBO [ultimate beneficial owner].  Outside of this, Alameda runs completely separate from FTX.  There is also no shared information access between the two entities."  Singh knew or was reckless in not knowing that FTX continued to present false and misleading information to potential investors through and including November 2022.

E.    **Even as the Scheme Was Spiraling Out of Control, Bankman-Fried and Ellison, with Wang and Singh's Knowledge, Continued to Mislead Investors and the Public About FTX's True Financial Condition.**

104.    On or about November 2, 2022, CoinDesk, a crypto news website, published an article stating that based on its review of an Alameda balance sheet it had obtained, Alameda held a large position in FTT and other FTX-associated tokens.  At Bankman-Fried's direction, Ellison responded on Twitter to reassure investors and the public that Alameda was financially sound.  Ellison did so on or about November 6, 2022, tweeting that the balance sheet referenced in the CoinDesk article (and elsewhere by that point) "is for a subset of our corporate entities, we have > $10 billion of assets that aren't reflected there."  Ellison continued:  "…given the tightening in the crypto credit space this year we've returned most of our loans by now."  The tweet was designed to provide false reassurance to customers by implying that Alameda had additional assets that meant its financial condition was stronger than the balance sheet suggested. At the same time, the tweet omitted the fact that the balance sheet did not accurately reflect the significant debt that Alameda owed to FTX.  In contrast to the positive message in her tweet, at that point, Ellison knew, or was reckless in not knowing, that Alameda was insolvent.

105.    On or about November 6, 2022, the CEO of Binance, a crypto asset trading platform, announced that "[d]ue to recent revelations that have came [sic] to light," Binance would liquidate its FTT holdings.  Binance held FTT then valued at more than $500 million, which it had received from FTX as part of Bankman-Fried's buyout of Binance's equity in FTX as an early round investor.

106.    Binance's announcement caused many FTX customers to withdraw their funds from FTX.  Singh, Wang, Ellison, and Bankman-Fried knew or were reckless in not knowing that given Alameda's large FTT holdings, any further drop in the value of FTT threatened the solvency of FTX, given Alameda's multi-billion-dollar liabilities.  Bankman-Fried engaged in a frantic campaign to prevent this outcome by assuring investors and the public that FTX was financially sound.

107.    Specifically, to prevent a collapse in the market price of FTT that Binance's sales might cause, Ellison, at Bankman-Fried's direction, tweeted an offer to buy Binance's entire stake, for $22 per token ("@cz_binance if you're looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!").  When Ellison sent this message she knew, or was reckless in not knowing, that in order for Alameda to be able to actually purchase Binance's FTT for $22 per token, Alameda would have to draw down additional funds from FTX itself, further extending its line of credit, or obtain funds from third-party lenders without disclosing its own tenuous financial condition.  Despite this, Ellison posted the tweet in an effort to support and increase the price of FTT, again using Alameda to impact the price of FTT in furtherance of the scheme.

108.    Similarly, attempting to maintain public and investor confidence in FTX, Bankman-Fried tweeted on or about November 7, 2022:  "FTX is fine.  Assets are fine … FTX has enough to cover all client holdings.  We don't invest client assets (even in treasuries).  We have been processing all withdrawals, and will continue to be …."  That tweet was false and misleading, and Bankman-Fried later deleted it.  Singh, Wang, Ellison, and Bankman-Fried knew that FTX, at Bankman-Fried's direction, had allowed Alameda to invest "client assets" and that Alameda had in fact done so, using FTX customer funds to make investments far riskier than

"treasuries."

109.    On or about November 7, 2022, Singh, along with Wang and other key FTX employees, gathered with Bankman-Fried in his apartment and engaged in a desperate attempt to raise money from current and potential investors, including U.S. investors.  Singh was present while Bankman-Fried and others made numerous calls to investors, and was aware that FTX employees were portraying the problem as a "liquidity crisis."  Singh knew that this depiction was materially misleading, because the solvency crisis facing FTX was due to a significant and irrecoverable loss of FTX customer funds by Alameda.  Singh was emotionally distressed, but continued to remain at the apartment, where he participated in discussions about public tweets and provided other employees with information about FTX technology when requested by potential investors.

110.    The next day, November 8, 2022, FTX paused all customer withdrawals, and the price of FTT plummeted by approximately 80%.  Alameda's collateral was worth far less than the amount Alameda had borrowed from FTX.  FTX was left with billions of dollars in effectively unrecoverable loans.

111.    On or about November 8, 2022, the CEO of Binance tweeted:  "FTX asked for our help.  There is a significant liquidity crunch.  To protect users, we signed a non-binding LOI, intending to fully acquire http://FTX.com and help cover the liquidity crunch.  We will be conducting a full DD [due diligence] in the coming days."

112.    It only took one day, however, for Binance to decide not to acquire FTX.  On or about November 9, Binance announced:  "As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of http://FTX.com."

113.     FTX customers withdrew approximately $5 billion from the platform that day.

114.     At the same time, Bankman-Fried continued to seek emergency funding from other investors, including U.S. investors, to cover a shortfall at FTX of approximately $8 billion. As part of this effort, Bankman-Fried circulated a balance sheet to potential investors that listed a negative $8 billion entry labeled as a "hidden, poorly internally labeled 'fiat@ account.'" This entry was a reference to the above-described "fiat@ftx.com" account and reflected FTX customer funds deposited in Alameda's bank accounts.

115.     During a meeting with Alameda employees on or about November 9, 2022, Ellison admitted that she, Bankman-Fried, Wang, and Singh were aware that FTX customer funds had been used by Alameda.

116.     On the morning of November 10, 2022, confronting the implosion of FTX and Alameda, Bankman-Fried tweeted:  "1) I'm sorry.  That's the biggest thing.  I f*cked up, and should have done better."[9]  In the same Twitter thread, Bankman-Fried announced that Alameda was "winding down trading" and soon would not trade on FTX at all.  Bankman-Fried maintained that "FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!)."  And he stated, among other things, that he was trying to "raise liquidity," claiming "[t]here are a number of players who we are in talks with, LOIs [letters of intent], term sheets, etc."

117.     Singh resigned from FTX on or about November 10, 2022.  The next day, November 11, 2022, Bankman-Fried resigned from FTX.  Shortly thereafter, FTX and approximately 100 affiliated entities, including FTX US, filed for Chapter 11 bankruptcy protection.

---

[9] Expletives have been redacted in part with asterisks.

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### (Violations of Sections 17(a)(1) and (3) of the Securities Act)

118.   The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 117.

119.   By reason of the conduct described above, Defendant, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting knowingly, recklessly, or, as to (ii), negligently, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

120.   By reason of the conduct described above, Defendant violated Securities Act Sections 17(a)(1) and (a)(3) [15 U.S.C. § 77q(a)(1) and (a)(3)].

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder)

121.   The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 117.

122.   By reason of the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers of the securities.

123.   By reason of the conduct described above, Defendant violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

A.   Permanently restraining and enjoining Defendant, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.   Ordering Defendant to pay disgorgement plus prejudgment interest of all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Exchange Act Sections 21(d)(3), (5), and (7) [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

C.   Ordering Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.   Ordering Defendant barred from acting as an officer or director pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

E.   Prohibiting Defendant from participating, directly or indirectly, including, but not limited to, through any entity controlled by him, in the issuance, purchase, offer, or sale of any securities, including crypto asset securities, provided, however, that such injunction shall not

prevent Defendant from purchasing or selling securities, including crypto asset securities, for his own personal account; and

      F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands trial by jury.

DATED:  New York, New York
           February 28, 2022

                                Respectfully submitted,

                                */s/ Jorge G. Tenreiro*
                                Jorge G. Tenreiro
                                David L. Hirsch (not admitted in SDNY)
                                Ladan F. Stewart
                                Amy Harman Burkart
                                David J. D'Addio
                                SECURITIES AND EXCHANGE
                                  COMMISSION
                                100 Pearl Street, Suite 20-100
                                New York, New York 10004
                                (212) 336-0153 (Stewart)
                                Email: StewartLa@sec.gov

                                *Attorneys for the Plaintiff*